## Savage Hyundai Inc. v. North American Warranty Services Inc.

C.P. of Berks County, no. 01-952.

*Joseph A. O'Keefe, Kenneth A. Jacobsen* and *Francis J. Farina,* for plaintiffs.
*Donald A. Rea* and *Edwin L. Mock,* for defendants NAWS, ANPAC, Gerling, IASI, CMG and LOTS.
*North American Holdings Inc.,* pro se.

LASH, *J.,* September 24, 2002—This matter comes before the court on plaintiffs' motion for class certification. Plaintiffs filed a memorandum of law in support of their position, as did defendants in opposition to plaintiffs' motion. A hearing was held on December 10, 2001 and April 4, 2002. For reasons set forth herein, we deny plaintiffs' motion.

## I. INTRODUCTION

Defendant, North American Warranty Services Inc. (NAWS), was the originator and administrator of an extended vehicle service contract program whereby defendant NAWS would enter into contracts with automobile dealerships, for the dealers to sell the NAWS extended service warranty contracts to the purchaser of automobiles. NAWS would then procure insurance for the coverage obligations owed to the consumers under the extended warranty contracts. Several companies acted as insurers of the contracts administered by NAWS, including defendant, American National Property and Casualty Co. (ANPAC), defendant, North American Holdings Inc., and Illinois Insurance Company (IIC),[1] among oth-

---

1. IIC was previously a named defendant in this suit, but was released by order of this court dated July 23, 2001.

ers. Many of these contracts, through approximately 1,400 dealers, were reinsured by defendant, Gerling Global Reinsurance Corporation of America. Other contracts were originally reinsured by IIC, who also originally reinsured Gerling.

The extended warranty contract contemplated that the dealer would charge market price to the consumer in exchange for the consumer receiving the extended warranty. The dealer would be required to remit a "net dealer cost" to NAWS, and keep the difference. The dealer could also obtain revenue by providing labor and parts for the covered services. Additionally, NAWS offered to certain dealers a "dealer retention reserve program" whereby NAWS would return to the dealer a percentage of the underwriting profit if the claims losses were below a certain percentage. Finally, certain dealers were also given the option of entering into an amendment to the dealer agreement to participate in what was called the "zero chargeback program." Here, the dealer would pay NAWS an additional fee and in exchange, NAWS would assume the responsibility to refund money to the consumer if the consumer cancelled his contract after 90 days.

Plaintiffs claim that IIC, NAWS, North American, Gerling and defendant, Insurance Administration Services Inc. (IASI), are all interrelated. Plaintiffs also claim that NAWS and IIC are insolvent due to mismanagement and that Gerling assumed control and responsibility for all extended service warranty contracts entered into by NAWS.

On or about February 2000, Gerling ceased any new business and thus ceased reinsuring the vehicle services

contract on an ongoing basis. The contracts already in existence became managed through a plan known as "run-off" through the new company IASI. From that point forward, Gerling and others contracted with IASI to administer the run-off.

Gerling claims that IASI now receives and processes premiums and claims transactions submitted under the existing extended warranty contracts. IASI makes a determination on coverage and either pays or denies the submitted claims. Further, once the warranty program went into "run-off," the qualifying dealers were no longer entitled to disbursement under the reserve payment program until the conclusion of the run-off, which is expected to continue until 2007.

Plaintiffs are several related dealerships, who allege that about April 15, 1994, they and NAWS entered into a contract whereby plaintiffs would sell extended warranty contracts in exchange for a percentage of the sales price and/or commission. Plaintiffs allege that they did sell several contracts, which were then to be administered by NAWS. Plaintiffs also allege participation in the reserve program and the zero chargeback program.

Plaintiffs then allege that defendants failed to honor the terms of the contracts with plaintiffs and that plaintiffs suffered damages, which at the time of the filing of the complaint was approximately $250,000, and which was "increasing monthly." Plaintiffs specifically argue that Gerling instructed IASI to "shave" claims or administer the run-off in such a manner as to substantially diminish the monies that would have to be paid out pursuant to Gerling's obligations under the contracts. Plaintiffs also claim that Gerling specifically instructed IASI to

refuse repeated demands by plaintiffs and other class members similarly situated for payment of monies due and owing them from their book of reserves, stemming from commissions which had accrued and were attributable to the contracts sold. Finally, plaintiffs allege that Gerling contrived to avoid having to make massive payouts from their assets, which exceeded $23 billion under the contracts they had issued, to guarantee the sufficiency of NAWS' reserves. These actions were in contravention of their obligations under the contracts and in violation of federal and state statutory laws.

Plaintiffs' complaint alleges the following legal theories in separate counts: breach of contract, unjust enrichment, detrimental reliance, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, violation of the Illinois Uniform Deceptive Trade Practices Act, violation of the Racketeer Influenced and Corrupt Organization Act of 1970 (RICO), and negligence. In addition to the claim for compensatory damages, the three counts alleging statutory violations also demand punitive damages.

On August 17, 2001, plaintiffs filed the within motion for class certification requesting that the action be certified as a class pursuant to Pa.R.C.P. 1702. Plaintiffs defined the class as follows:

"All automobile dealerships in the Commonwealth of Pennsylvania and throughout the continental United States engaged in the business of selling and servicing new and used automobiles and/or various products related thereto, including, but not limited to, extended service contracts and/or service contracts, also known as aftermarket insurance policies that provide payment(s)

for mechanical breakdown protection either in addition to or supplementing the manufacturers' original contract or for vehicles whose original contract has expired, who contracted with North American Warranty Services Inc., or North American Holdings Inc., or any of their affiliates, predecessors, or successors, to insure, guarantee, or otherwise administer those service contracts."

In accordance with Pa.R.C.P. 1710, the court enters the following findings of fact, discussion, and conclusions of law:

## II. FINDINGS OF FACT

(1) Plaintiffs are automobile dealerships engaged in the business of selling and servicing new and used automobiles. Plaintiffs Savage Hyundai Inc., Savage Kia Inc., and Savage Hyundai, O.N. Inc. (collectively Savage) and plaintiff Ext-W Inc. are all Pennsylvania corporations with places of business at 9 Parkside Drive, K-Mart Shopping Center, Shillington, Berks County, Pennsylvania.

(2) Plaintiffs are among hundreds of automobile dealers who participated in defendants' vehicle service contract program, a type of extended warranty program sold to purchasers of new and used cars by the plaintiff dealerships. Plaintiffs and other dealer class members sold the extended warranty program and retained a portion of the sales price of each contract as a "commission."

(3) Plaintiff Ext-W Inc. was assigned revenues derived from Savage's participation in the extended warranty program.

(4) Defendant NAWS is an Illinois corporation which, at all relevant times, had offices at 2901 Butterfield Road, Oak Brook, Illinois 60521.

(5) NAWS utilizes independent marketing agents to solicit dealer participation in the extended warranty program for sales of the vehicle service contracts and administered the extended warranty program on behalf of the dealers and the insurers of the program, identified below.

(6) NAWS went into liquidation in July 1999 and discontinued operations in February 2000.

(7) Defendant ANPAC is a Missouri corporation with offices at 1949 East Sunshine, Springfield, Missouri 65899-0001, that regularly transacts and conducts business in the Commonwealth of Pennsylvania and the County of Berks.

(8) ANPAC insured the approximately 80 percent of the vehicle service contracts marketed by NAWS and all of those sold by the dealer class.

(9) ANPAC received a "fronting fee" or commission of 5 percent of the premiums from the sales of the extended warranty program by the dealer class, then reinsured its full risk and liability under the extended warranty program with Gerling.

(10) Defendant Gerling is an international corporation with offices at 110 William Street, New York, New York 10038-3901.

(11) Gerling reinsured the extended warranty program marketed by NAWS and insured by ANPAC.

(12) Like ANPAC, Gerling also received a "fronting fee" or commission of 3 percent of the premiums from the extended warranty program sales. Gerling then, in turn, reinsured its full risk and liability under the extended warranty program with Illinois Insurance Company.

(13) IIC is an affiliate of NAWS which, like NAWS, is a wholly-owned subsidiary of defendant, North American Holdings Inc.

(14) Until June 1998, North American was owned by Roger P. Freelund, Bill Mette and Steve Cuculich. Freelund was simultaneously president of NAWS, North American and IIC at all relevant times. Mette was simultaneously Secretary, Treasurer and Chief Financial Officer of NAWS, North American and IIC at all relevant times.

(15) IIC was placed in liquidation in July 1999.

(16) A year before the commencement of IIC's liquidation in July 1999, Gerling stopped ceding its risk under its reinsurance agreements to IIC, so Gerling is now ultimately liable for payment of all claims and other obligations under the extended warranty program.

(17) Plaintiffs contend that at some time between October 1997 and July of 1998, Freelund was found to be mismanaging the reserve accounts established with the premium funds received by NAWS from the sales of the extended warranty program by the dealer class. That is, Freelund was operating "out of trust."

(18) According to plaintiffs, upon learning of the overstated reserves of NAWS, Gerling instructed Freelund to turn over all of NAWS' assets to Gerling's control or face further action.

(19) Plaintiffs allege that Freelund turned all of NAWS' assets over to Gerling's control.

(20) According to plaintiffs, Gerling hired Cuculich to "straighten out" NAWS, that is, to make NAWS financially sound.

(21) Plaintiffs contend that Cuculich took control of NAWS on behalf of Gerling, and continued its day-to-day operation, unabated, from the date of Freelund's departure through February 2000. Now under Gerling's control, NAWS continued to accept premiums from plaintiffs and other dealers for the extended warranty program.

(22) In February 2000, Gerling decided to stop reinsuring extended warranties written after April 2, 2000. As a result of this decision, NAWS determined that, because it would no longer earn income from the sale of new warranties, it could no longer operate as administrator of the program. Accordingly, Gerling appointed a newly-organized corporation, Insurance Administration Services Inc., to act as administrator of the program with respect to warranties issued prior to April 3, 2000.

(23) Although Gerling had decided to no longer reinsure new extended warranties, it nevertheless remained financially responsible for previously issued warranties. Extended automobile warranties have lives ranging from a few months to as many as seven years after a car is placed in service.

(24) Since no new extended warranties are being written under the program, neither ANPAC nor Gerling are receiving additional "fronting" fees or commissions from vehicle service contract (VSC) sales. Nevertheless, ANPAC and/or Gerling remain financially responsible for all obligations under the program.

(25) Defendant IASI is an Illinois corporation with offices at 4415 W. Harmon Street, Suite 201, Hillside, Illinois 60162. IASI's headquarters were previously located at 2901 Butterfield Road, Oak Brook, Illinois 60521, the same address as NAWS. Furthermore, IASI's

telephone number is the same as NAWS, and IASI employs staff who were previously employed by NAWS before NAWS' financial collapse in February 2000.

(26) According to defendants' witness, Cohen, IASI's business operations include the "administration of the same ANPAC insurance contracts that NAWS had administered."

(27) Although IASI is not soliciting sales of new extended warranty contracts, IASI is "administering the run-off of NAWS' book of business"—that is, processing claims under existing contracts—and "handling cancellations" under the vehicle service contracts in existence.

(28) IASI was founded by James Devers, who serves as its president and who previously was employed by NAWS as NAWS' director of accounting and, thereafter, as NAWS' chief financial officer. Devers owns 75 percent of the stock of IASI, having sold 25 percent of the company to Cohen, IASI's senior vice president and general counsel. Cohen also was previously employed by NAWS as its vice president and general counsel.

(29) In his capacity as director of accounting at NAWS, Devers "was responsible for the management of the accounting, employees, preparation of financial statements, [and] did special projects for management." When Devers became chief financial officer of NAWS in June 1999 (a position Devers held until NAWS' collapse and IASI's formation in February 2000), he performed "[m]any of the same functions" as he did as director of accounting, but also assumed control of the "cash management side of the business."

(30) Devers stated at the April 4 hearing that NAWS' financial collapse was followed by Gerling's withdrawal

as the reinsurer for extended warranty contracts marketed by NAWS and insured by ANPAC. According to Devers, Gerling's termination of its reinsurance relationship with NAWS was based on Gerling's "concerns with [NAWS] concerning trust funds [and] inadequate rates." Gerling also "didn't trust [NAWS'] management." Devers said at the April 4 hearing, Gerling was concerned that there was a "deficiency in trust at NAWS;" that is, that separate trust accounts maintained for the benefit of the dealer class were being inadequately funded by NAWS, and that master trust accounts also held for the dealers were similarly underfunded by NAWS.

(31) As chief financial officer of NAWS, Devers acknowledged that he was "responsible for the trust accounts that Gerling had expressed concerns about." Despite this responsibility, Gerling hired Devers' new company, IASI (also owned by Cohen, the former vice president and general counsel of NAWS), to handle the administration of claims and other tasks previously performed by NAWS.

(32) Plaintiffs and other putative class members entered into dealer agreement with NAWS for sales of the extended warranties. The dealer agreements were standard form, "fill-in-the-blank" contracts used by NAWS throughout the country.

(33) All known copies of the dealer agreements contain an identically worded, choice of law provision, which states:

"The validity, interpretation and performance of this agreement shall be controlled by and construed under the laws of the State of Illinois."

(34) The dealers were obligated to refund a portion of premium payments to customers who cancelled their extended warranty coverage under the extended warranty program. Paragraph 8 under NAWS obligations of the consumer car care, dealer agreement (exhibit 39) says: "In the event of cancellation of a VSC, all applicable fees received by (NAWS) and dealer in connection with such contracts will be refunded pro rata as determined by (NAWS)."

(35) Because the dealers had already passed along most of the premium dollars to NAWS and the other defendants (from which ANPAC and Gerling received their "fronting fees" or commissions), many dealers insured this liability to their customers through participation in the zero chargeback program. Under the zero chargeback program, dealers paid NAWS an additional fee of approximately $60 for each extended warranty sold by the dealers. In exchange, NAWS agreed to refund the dealer (or the customer directly) the premium for the extended warranty contract—including the dealer's pro rata commission—if the customer cancelled the contract after 90 days.

(36) Dealer participation in the zero chargeback program was via an amendment to the underlying dealer agreement. This amendment was itself a standard form, "fill-in-the-blanks" type contract uniform throughout the country.

(37) Some dealers also participated in a program called the dealer reserve program, under which the dealer would receive underwriting profits (a type of profit sharing arrangement) based on the claims experience under the warranty program.

(38) To "qualify" for profit sharing under the dealer reserve program in a particular year, a dealer was required to have a "loss ratio" on its book of extended warranty program business of 90 percent or less in that year; that is, aggregate net paid claims must have been 90 percent or less than aggregate net premiums received for the year.

(39) Dealer participation in the dealer reserve program also was via standard form, "fill-in-the-blanks" contracts uniform throughout the country.

(40) According to defendants' own exhibits and testimony, 1,404 dealer class members sold extended warranties which were reinsured by Gerling.

(41) Of those 1,404 dealers, 117 are located in Pennsylvania—the third largest concentration of class members (after Texas and Georgia) in the United States.

(42) More than half of these 1,404 dealers sold extended warranties that were insured by ANPAC. All, in turn, were reinsured by Gerling.

(43) Of those 1,404 dealers, 200 participated in the dealer reserve program.

(44) Of those 1,404 dealers, 97 participated in the zero chargeback program.

(45) The July 1995 solicitation, underwriting, claim adjusting and claim payment agreement among NAWS, ANPAC and Gerling sets forth some of the rights and obligations of the respective parties.

(46) In the underwriting agreement, ANPAC specifically authorized NAWS, on ANPAC's behalf, to "solicit" and "service" the extended warranty program, using policy forms and other documents approved by ANPAC.

(47) ANPAC also requires NAWS to follow "the solicitation and servicing system" devised by ANPAC.

(48) In the underwriting agreement, ANPAC expressly reserved all rights to approve all marketing materials for the extended warranty program.

(49) The rights and obligations of defendant Gerling, as reinsures, also are addressed in part in the underwriting agreement. Under that agreement, policy premiums from sales of the VSCs by the plaintiff dealers and received by NAWS are the "property" of ANPAC and Gerling, not NAWS.

(50) ANPAC and Gerling expressly authorize NAWS to collect such premiums on their behalf, and to segregate such funds into separate "reserve" or "trust accounts" on behalf of ANPAC and Gerling for the ultimate benefit of the dealer class.

(51) The underwriting agreement is signed by Freelund, NAWS' founder and then president, on behalf of NAWS.

(52) Pursuant to the underwriting agreement, NAWS and ANPAC, on January 2, 1996, entered into two contractual liability insurance policies with NAWS as the insured and ANPAC as the insurer.

(53) Under those policies, ANPAC insured NAWS' obligations under the extended warranty program marketed and administered by NAWS and sold by the dealer class.

(54) In the first policy, ANPAC appointed NAWS as its administrator of the extended warranty program "to receive, adjust, negotiate, compromise and satisfy all claims" under the program and to pay "on behalf of

[ANPAC] all valid claims, demands or liabilities under the program."

(55) The first policy is countersigned by Freelund on behalf of ANPAC as an "authorized representative" of ANPAC.

(56) Freelund was president of NAWS when he signed this policy on behalf of ANPAC.

(57) The second policy obligated ANPAC to reimburse NAWS "for all costs reasonably incurred [by NAWS] in fulfilling its legally binding obligations under each designated contract."

(58) The second policy, like the first policy, is countersigned by Freelund as the "authorized representative" of ANPAC pursuant to the requirement of the "witness" clause on the last page of the document.

(59) Under Gerling's August 21, 1995 reinsurance policy with ANPAC (reinsurance treaty), Gerling assumed "all of [ANPAC's] liability under all policies issued by and on behalf of [ANPAC] by [NAWS] . . . ."

(60) "Policies are defined in the reinsurance treaty as "all binders, policies, contracts, certificates and other obligations, whether oral or written, of insurance."

(61) In the reinsurance treaty, Gerling expressly assumed liability not only for the obligations of ANPAC, but also for NAWS' obligations as well, including ANPAC's and NAWS' obligations under the underwriting agreement.

(62) Under the reinsurance treaty, NAWS was obligated to make regular, periodic monthly reports to ANPAC and Gerling concerning dealer reserves accounts and other financial data.

(63) Under the reinsurance treaty, if NAWS is unable to administer the extended warranty program, Gerling can replace NAWS, but Gerling is financially responsible for all costs of administration and for full repayment of dealers' refunds and other obligations under the warranty program.

(64) Other aspects of the relationships among Gerling, NAWS and ANPAC are set forth in the master trust agreement among the parties relating to the contracts "written by" ANPAC and "produced by NAWS."

(65) Under the master trust agreement, NAWS administers the extended warranty program "for and on behalf of" Gerling (expressly identified as the beneficiary under the master trust agreement) and ANPAC. All dealer premium funds and reserve monies received by NAWS are placed "in trust for the benefit of" Gerling.

(66) One purpose of the master trust agreement was to create two trust accounts—a primary trust account and a custodial account—for Gerling from the dealers' premiums.

(67) Gerling retained total control over the disposition of the funds.

(68) As with the standard form, "fill-in-the-blanks" dealer agreements, the master trust agreement has an express choice of law provision:

"This agreement shall be made subject to and be governed by the laws of the State of Illinois, without consideration of principles of conflicts of law."

(69) The complaint filed by plaintiffs against defendants alleges seven different legal theories, set forth in separate counts, and claims compensatory damages of

approximately $250,000 at the time of filing the complaint, and "increasing monthly."

(70) The first count is entitled "breach of contract" and alleges that Gerling and IASI administered the run-off in complete disregard to the agreements.

(71) The second count is entitled "unjust enrichment" and alleges that defendants have benefited and continue to benefit from the refusals of Gerling and IASI to honor their obligations under the zero chargeback program and to pay accrued and owing reserves. Further, plaintiffs claim that but for Gerling and IASI refusing to honor these obligations, NAWS' reserves would be depleted significantly if not entirely, thus no run-off could be conducted without a significant infusion of capital, thus defendants were unjustly enriched at plaintiffs' expense.

(72) The third count is entitled "Detrimental Reliance," alleging that plaintiffs relied upon Gerling and NAWS' acceptance of zero chargeback movies and contract monies and the presumed continuation of NAWS' operations, that plaintiffs relied upon the guarantees of defendants that they were fully insuring the obligations of NAWS, and that the reliance was to plaintiffs' detriment in that they suffered substantial monetary damages.

(73) The fourth count of plaintiffs' complaint is entitled "violation of the Illinois Consumer Fraud and Deceptive Business Practices Act," alleging that defendants' actions as already set forth were intentionally planned as a scheme to illegally hide the overvaluation of NAWS' reserves, to withhold a true accounting of said reserves, to shave claims through the improper policies of IASI in administering NAWS' run-off, and consequently to minimize exposure under the agreements, all in violation of

the Illinois Consumer Fraud and Deceptive Business Practices Act. This count is against defendants Gerling, IASI, ANPAC, and North American, only.

(74) The fifth count of plaintiffs' complaint is entitled "violation of the Illinois Uniform Deception Trade Practices Act," whereby plaintiffs allege that the actions complained of and committed by defendants were intentional and aimed at limiting their exposure for NAWS' overvaluation of its reserve, thereby avoiding liability under their respective contracts, that these practices were intentional, unreasonable and vexatious and in violation of the Illinois Consumer Fraud and Deceptive Business Practice Act. This count is against defendants Gerling, IASI, ANPAC, and North American, only.

(75) The sixth count of plaintiffs' complaint is entitled "violation of the Racketeer Influenced and Corrupt Organization Acts of 1970," whereby plaintiffs allege that the actions complained of committed by defendants were a conspiracy to conduct, directly or indirectly, their affairs through a pattern of racketeering activity, which included repeated acts of mail and wire fraud, in violation of RICO. This count is against defendants Gerling, IASI, ANPAC, and North American, only.

(76) The seventh count of plaintiffs' complaint is entitled "negligence" and is filed against defendants Consumers Marketing Group (CMG) and Life of the South Co. (LOTS), only. Here, plaintiffs complain that the named defendants had a duty to insure that the reserves of NAWS were accurately and correctly appraised, that defendants were notified on numerous occasions that the claims and reserved movies were not being properly administered and/or paid, that named defendants

failed to act to verify the complaints, and that defendants thereby breached their duties to plaintiffs, causing damages.

## III. DISCUSSION

In resolving a motion for class action certification: "the courts *sole* consideration is whether the action shall continue as a class action or as an action with individual parties. In doing so, the court must consider, inter alia, whether the class meets the numerosity, typicality, and commonality requirements of Pa.R.C.P. [1702], as well as other criteria for class certification detailed in Rules 1708 and 1709. The Rules specifically provide that 'the merits of the action and the right of the plaintiff to recover are to be excluded from consideration . . . .' " *Dunn v. Allegheny County Property Assessment Appeals and Review,* 794 A.2d 416, 422-23 (Pa. Commw. 2002). (citations omitted) (emphasis in original)

The decision is governed by Pa.R.C.P. 1702, containing five prerequisites, all of which must be met by plaintiffs for their motion to be granted. These prerequisites include:

(1) The class is so numerous that joinder of all members is impracticable;

(2) There are questions of law or fact common to the class;

(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4) The representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

(5) A class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

In determining whether these prerequisites are satisfied, the court is vested with broad discretion, *Cambanis v. Nationwide Insurance Company,* 348 Pa. Super. 41, 51, 501 A.2d 635, 640 (1985), *Janicik v. Prudential Insurance Company of America,* 305 Pa. Super. 120, 128, 451 A.2d 451, 457 (1982), with the understanding that decisions in favor of maintaining a class action should be liberally made. *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 449, 500 A.2d 1137, 1141 (1985).

The burden of proving that class certification is appropriate is on the moving party. While the burden is not heavy, more than mere conjecture or conclusory allegations are required to enable the court to conclude that the class certification requirements are met. *Dunn v. Allegheny County Property Assessment Appeals and Review,* 794 A.2d at 423. "Once the class proponent has established that each of the above elements is satisfied, the class opponent shoulders the burden of proving, with contrary evidence, that class certification is not proper." *Id.* at 423.

We turn then to the analysis required under Rule 1702:

## 1. *Numerosity*

The class must be both numerous and identifiable. "Whether the class is sufficiently numerous is not dependent upon any arbitrary limit, but upon the facts of each case." *Cook v. Highland Water and Sewer Authority,* 108 Pa. Commw. 222, 229, 530 A.2d 499, 503 (1987). A class is sufficiently numerous if "the number of poten-

tial individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should [plaintiffs] sue individually." *Foodarama Supermarkets Inc. v. American Insurance Co.,* 43 D.&C.4th 467, 493 (Philadelphia Cty. 2000) (quoting *Temple University v. Pennsylvania Department of Public Welfare,* 30 Pa. Commw. 595, 603, 374 A.2d 991, 996 (1977)).

Plaintiffs contend that approximately 1,400 dealers participated in the warranty program and marketed extended warranty contracts that were reinsured by Gerling. These dealers are located in 41 states. Of these, 97 dealers participated in the zero chargeback program, and 200 dealers (in 70 dealer groups) participated in the dealer reserve program.

Defendant contends that the numerosity requirement has not been satisfied. They contend that the actual class size is limited. By their count, only 18 dealers (in eight dealer groups) were entitled to a dealer reserve payment as part of the dealer reserve program in 1999, and of that 18, only plaintiffs are located in Pennsylvania. Further, the defendants contend that only 97 dealers participated in the zero chargeback program, and of that 97, only plaintiffs are located in Pennsylvania. Defendants indicate that the total possible class is 102 dealers.

Plaintiffs established sufficient evidence at the hearing to meet this burden. See notes of testimony, April 4, 2002, p. 107, l. 19; p. 108, l. 8; p. 111, l. 6; p. 115, l. 5. See also, plaintiffs' exhibits 44 and 46. The defendants' argument also fails because the plaintiffs proposed class is not limited to those who participated in all three programs. Plaintiffs wish to certify a class of "all automo-

bile dealerships . . . engaged in the business of selling and servicing new and used automobile . . . after-market insurance policies," that is any and all dealerships that contracted with NAWS to participate in the warranty program that Gerling reinsured. We hold that the plaintiffs have satisfied their burden of establishing numerosity.

## 2. *Commonality*

Plaintiffs must establish that their claims present common questions of law or fact, that apply to the whole class. See Pa.R.C.P. 1702(2). "The common question of fact means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all." *Allegheny County Housing Authority v. Berry,* 338 Pa. Super. 338, 342, 487 A.2d 995, 997 (1985); see also, *Cook v. Highland Water and Sewer Authority,* 108 Pa. Commw. at 231-32, 530 A.2d at 504. The existence of individual questions essential to a class member's recovery is not necessarily fatal to the class; there must be a "*predominance* of common issues, shared by all the class members, which can be justly resolved in a single proceeding." *Foodarama* at 495 (quoting *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 408-409, 615 A.2d 428, 431 (1992). (emphasis in original)

This court must analyze whether commonality exists under each count of the plaintiffs' complaint.

### a. Breach of Contract

Plaintiffs contend that the proposed class is linked by the same practice or course of conduct on the part of the

defendants. In their motion for class certification, plaintiffs allege that the defendants acted in common with respect to all potential class members in that (1) all the various plaintiffs entered into similar or identical contracts with the defendants; (2) the defendants breached the terms of the agreements; (3) that Gerling instructed IASI to administer the "run-off" in a manner that would reduce its monetary obligation under the contracts, by shaving claims and refusing plaintiffs' repeated demands for payment owed under the applicable contracts in complete disregard of the agreements. Plaintiffs' breach of contract claim was levied against defendants Gerling, IASI, American, IIC and North American.

### Contract breach

Pennsylvania courts have certified classes where a plaintiff asserts a breach of contract. See *Sharkus v. Blue Cross of Greater Philadelphia,* 494 Pa. 336, 431 A.2d 883 (1981). This is especially true of form contracts. *Parsky v. First Union Corp.,* 51 D.&C.4th 468, 482 (Philadelphia Cty. 2001). Plaintiffs rely on the proposition that common questions will exist if the parties' grievance arises out of the "same practice or course of conduct." *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. at 133, 541 A.2d at 457, citing *Ablin Inc. v. Bell Telephone Co. of Pennsylvania,* 291 Pa. Super. 40, 435 A.2d 208 (1981). However, plaintiffs' reliance is misplaced. In *Ablin,* the "course of conduct" was selling telephone book advertising space to non-creditworthy buyers in a manner different than the same space was sold to creditworthy buyers. In *Janicik,* the "course of conduct" was based on interpreting a contract provision;

thereby creating identical liability situations. See *Foodarama Supermarkets v. American Insurance Co., supra.* However, plaintiffs are not requesting certification on an interpretation of the contract as in *Janicik,* nor are they requesting this court look at a simple purchase transaction, as in *Ablin.*

Plaintiffs are requesting this court determine that the defendants participated in a generalized course of conduct including the denial of claims under the extended warranty contracts, the improper "shaving" of the run-off, and refusal to remit movies due to plaintiffs under the zero chargeback and reserve programs. The consumer car care dealer agreement, signed by the parties, provides that "(NAWS) *shall investigate* and administer all claims covered under approved vehicle service contracts . . . ." (emphasis added) This would require individualized proof on liability as to each class member to establish that the denial of claims was actually improper and that the shaving occurred.

### Choice of law

The contract contains a provision, which provides that the laws of Illinois control the contract. Specifically, "[t]he validity, interpretation and performance of this agreement shall be controlled by and construed under the laws of the State of Illinois." This raises a choice of law question. A state has jurisdiction in cases that arise within its borders; states may also assume jurisdiction over cases and controversies that have some significant relationship to the state or which the government has an interest in protecting the rights of its citizens. Pennsylvania has a hybrid approach.

"When faced with choice of law questions, Pennsylvania courts have abandoned the rule of lex loci delicti in favor of a less restrictive approach combining the methodologies of a 'government interest analysis' and the 'significant relationship' approach of the Restatement (Second) of Conflicts §145 (1971). See also, *Griffith v. United Air Lines Inc.,* 416 Pa. 1, 203 A.2d 796 (1964). The paramount consideration under this analysis is: the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law. *McSwain v. McSwain,* 420 Pa. 86, 94, 215 A.2d 677, 682 (1966). Furthermore, in reviewing the relative interests of each jurisdiction in a cause of action, Pennsylvania courts will weigh their respective contacts qualitatively, rather than quantitatively." *Giovanetti v. Johns-Manville Corp.,* 372 Pa. Super. 431, 436, 539 A.2d 871, 873 (1988).

This choice of law conflict touches on two important legal issues. First, who is bound by this contract, and second, what law then applies?

### Parties to the contract

The plaintiffs signed three agreements: First, the consumer car care dealer agreement, second the dealer agreement for dealer reserve retention program, and third an amendment to the dealer agreement, which enrolled the plaintiffs into NAWS' zero chargeback program. All three agreements were made between the plaintiffs and NAWS. Under the plain terms of the contract, only NAWS and the plaintiffs are subject to Illinois law. It does not automatically follow that ANPAC, IIC, Gerling, and IASI

are subject to Illinois law within this jurisdiction under this contract. The potential liability of these named defendants then becomes a question of agency. But which agency laws apply? Is it the state in which the agency was created, or the state in which the contract between plaintiffs and the named defendant was created? This court would have to perform an agency analysis for each class member.

After this court determined who is a party to these contracts, the next step would be to determine whose law applies to its interpretation. If Illinois has a conflict of laws policy that relinquished jurisdiction to the state with the most significant contacts, then as to the named plaintiffs, Pennsylvania law may apply because NAWS reached into this state for business purposes, all three contracts were signed in Pennsylvania, and the service under those contracts was performed in Pennsylvania. However, other potential plaintiffs may have the right to have their owns states' laws apply. Plaintiffs have not presented sufficient evidence to meet their prima facie burden to establish a common question of law.

## Damages

Also of great concern is the issue of damages. While it is true that a class member's damages are often individual and that the existence of individual questions of this nature are not necessarily fatal to a class certification, nevertheless, "common questions of law or fact *must predominate* over individual questions." *Dunn v. Allegheny County Property Assessment Appeals and Review,* 794 A.2d 416, 424 (Pa. Commw. 2002). (emphasis added)

In this case, the individual damages may vary greatly from one class member to the next. Proof of these individual damages may require extensive testimony. For example, plaintiffs claim that they have performed labor and provided materials for customers, for which they are requiring reimbursement from defendants under the terms of the extended warranty contract. Defendants have stated that their policy is to review each claim for reimbursement and approve or deny the claim based on the merits. Thus, to establish damages, each class member may be required to present sufficient evidence to prove what labor was performed, what materials were supplied, and whether the original claim submitted by the customer was valid. The customer claims would be numerous and peculiar to each class member. A consideration of this type of damage claims among potentially 1,400 class members would present one court with an intolerable burden. In essence, assuming plaintiffs establish liability, the court would have to order 1,400 separate trials on the issue of damages. Class actions were not designed for this purpose. Damages in class actions are generally of the type which require the establishment of a formula which applies to all class members plus a simple calculation, or, in the alternative, a lump sum verdict which is apportioned among the class members in some fashion. "A class is unmanageable when damages cannot be determined by 'mathematical or formula computations.'" *Klusman v. Bucks County Court of Common Pleas,* 128 Pa. Commw. 616, 631, 564 A.2d 526, 534 (1989), quoting *State of Alabama v. Blue Bird Body Co. Inc.,* 573 F.2d 309, 326 (5th Cir. 1978).

Further, from a damages standpoint, class actions are permitted and encouraged to provide a forum for small

claimants to seek compensation for claims that would otherwise be too small to litigate. *Dunn v. Allegheny County Property Assessment Appeals and Review,* 794 A.2d at 423. See Pa.R.C.P. 1708(a)(6) and (7). Here, plaintiffs are claiming in excess of $250,000, plus continuing losses and punitive damages. Assuming plaintiffs' allegations on liability are true, other class members would be similarly situated.[2] Thus many, if not all, class members have substantial claims, which are economically feasible to pursue.

The individual questions on damages predominate over the common questions of law or fact; therefore, commonality has not been established. For the reasons set forth, this court determines that the plaintiffs have failed to present sufficient evidence to meet their burden in establishing that both common questions of fact and law apply to the breach of contract claim.

### b. Unjust Enrichment

In Pennsylvania, to establish unjust enrichment plaintiff is required to prove a benefit conferred on the defendant by the plaintiff, appreciation of such benefit by the defendant, and acceptance and retention of such benefit under circumstances that would create an inequity if defendant retained the benefit without payment. See *Mitchell v. Moore,* 729 A.2d 1200, 1203 (Pa. Super. 1999). *"In determining whether the doctrine applies, a court's focus is not on the in-*

---

2. This assumes that plaintiffs' argument that the claims are typical of the claims of the class is valid. On the other hand, if other class members have small claims, this alone may defeat the "typicality" argument.

*tention of the parties, but rather on whether the defendant has been unjustly enriched." Id.* at 1204. (emphasis in original) The plaintiffs claim that the defendants have been unjustly enriched because the defendants continued to take the plaintiffs' money under the zero chargeback program without honoring its obligations under the agreement.

Plaintiffs contend that they have paid over $60,000 to defendants for participation in the zero chargeback program. They also contend that as a result of defendants' actions, they have paid over $90,000 to extended warranty contract holders who canceled their contracts prior to expiration. Plaintiffs allege that defendants have benefited from this money to the plaintiffs' detriment. Defendants contend that the laws of Illinois and Pennsylvania differ, and that depending on which law applies, individual facts would predominate.

Again, plaintiffs cannot rely on Illinois law for the choice of law. In addition to reasons already set forth, the Illinois contract provisions would not apply under this theory. The damages analysis previously stated would also apply here.

## c. Detrimental Reliance

Plaintiffs allege that they relied upon defendants' acceptance of payment under the zero chargeback program as evidence that defendants were fully insured. They allege that defendants' actions and statements were misrepresentations designed to mislead plaintiffs and that plaintiffs suffered losses of over $250,000. Plaintiffs also contend that other members of the class would have been similarly treated to their detriment.

In Pennsylvania, detrimental reliance or promissory estoppel arises "when a party relies to his . . . detriment on the intentional or negligent representations of another party, so that in order to prevent the relying party from being harmed, the inducing party is estopped from showing that the facts are not as the relying party understood them to be." *Thomas v. E.B. Jermyn Lodge No. 2,* 693 A.2d 974, 977 (Pa. Super. 1997), *appeal denied,* 550 Pa. 706, 705 A.2d 1309 (1998). The elements of promissory estoppel or detrimental reliance are: "(1) misleading words, conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty . . . on the party seeking to assert estoppel." *Id.*

Under this legal theory, individual factual issues predominate over common questions of fact. In *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 460, 470-71, 619 A.2d 769, 774 (1993), the Superior Court stated that the existence and proof of reliance generally requires an individual determination as to each potential class member.

If this class were to be certified under this theory, each plaintiff would have to prove to the fact-finder's satisfaction the nature and extent of the reliance. In dealing with potentially 1,400 plaintiffs, each of whom would have to establish the underlying facts relating to the detrimental reliance, the court and the fact-finder would be severely overburdened.

For reasons already set forth, plaintiffs also failed to establish the commonality requirement on the basis of the choice of law concern and on the issue of damages.

## d. Illinois Consumer Fraud and Deceptive Business Practices Act

Plaintiffs allege that the defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Conp. Stat., 505/1 et seq., which says:

"Section 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in section 2 of the 'Uniform Deceptive Trade Practices Act,' [sic] in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby. In construing this section consideration shall be given to the interpretation of the Federal Trade Commission and the federal courts relating to section 5(a) of the Federal Trade Commission Act."

In order to establish a violation, plaintiffs must show that (1) the defendant committed a deceptive act, such as the misrepresentation or concealment of a material fact; (2) the defendant intended to induce the plaintiff's reliance on the deception; and (3) the deception occurred in a course of conduct involving trade or commerce. *Nilsson v. NBD Bank of Illinois,* 731 N.E.2d 774, 784 (Ill. App.1 Dist. 1999). Plaintiff's reliance is not an element of statutory fraud; rather a claim must show that the consumer fraud proximately caused the plaintiff's injury. *Id.* The intent required is merely the defendant's intent that the plaintiff in the action rely on the act that defendant per-

formed or information defendant gave to plaintiff, as opposed to any intent on the defendant's part to deceive. *Id.*

A material fact exists where "(1) a plaintiff would have acted differently had he or she been aware of the information, or (2) it concerned the type of information upon which he or she would be expected to rely in making a decision to act." *Oliveira v. Amoco Oil Co.,* 726 N.E.2d 51 (Ill. App.4 Dist. 2000), *rehearing denied, appeal allowed,* 189 Ill.2d 690, *appeal allowed,* 734 N.E.2d 895.

Essentially, this is a detrimental reliance test. As stated earlier, the existence and proof of reliance generally requires an individual determination as to each potential class member. *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 470-71, 619 A.2d 769, 774 (1993). At this time, this court incorporates its reasoning on the detrimental reliance count, and determines that this count is inappropriate for class certification.

Additionally, the Illinois courts have stated that the Consumer Fraud and Deceptive Business Practices Act does not apply to nonresident consumers. *Oliveria v. Amoco Oil Co.,* 726 N.E.2d at 61. The appellate court said, "Illinois has no authority to regulate out-of-state transactions effecting non-Illinois citizens, and has no interest in doing so. Further, while Illinois has an interest in seeing Illinois corporations do not engage in deceptive practices, its Consumer Fraud Act does not apply to consumers outside Illinois or business conducted outside Illinois." *Id.* Thus, the choice of law problem would also defeat commonality. The damages analysis previously stated would also apply here.

### e. Illinois Uniform Deceptive Trade Practices Act

Plaintiffs allege that defendants violate the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Conp. Stat. 510/2. This statute says:

"Section 2. Deceptive trade practices.

"(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: (1) passes off goods or services as those of another; (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another; (4) uses deceptive representations or designations of geographic origin in connection with goods or services; (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; (6) represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; (8) disparages the goods, services, or business of another by false or misleading representations of fact; (9) advertises goods or services with intent not to sell them as advertised; (10) advertises goods or services with intent not to supply reasonable expectable public demand, unless the advertisement discloses the limitation of quantity; (11) makes false or misleading statements of fact concerning the rea-

sons for, existence of, or amounts of price reductions; (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

Plaintiffs contend that defendants actions created a likelihood of confusion or of misunderstanding. However, plaintiffs have not alleged, with any particularity, what facts sustain this allegation. Plaintiffs have not presented sufficient underlying facts as to this count of the complaint for this court to conclude that they have met their prima facie burden. "Though this initial [prima facie] burden is not heavy, it requires more than mere conjecture and conclusory allegations, especially if facts of record tend to contradict the propriety of the class action." *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. 130, 451 A.2d at 455.

Again, the choice of law and damages concerns also apply here.

## f. RICO

Plaintiffs allege that the defendants violated the federal Racketeer Influenced and Corrupt Organizations Act of 1970, specifically, 18 U.S.C. §§1962(c) and (d), which state, in pertinent part:

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activity of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

"Racketeering activity consists of no more and no less than the commission of a predicate act." *Sedima, S.P.R.L. v. Imrex Co. Inc.,* 473 U.S. 479, 495 (1985). The underlying predicate acts plaintiffs allege giving rise to this RICO violation, as set forth in the plaintiffs' complaint, include violations of the federal mail fraud[3] and wire fraud[4] statutes. Plaintiffs allege that the defendants violated RICO by "the repeated and/or routine transferring of claims and/or claims denials by express mail, monies via wire transfers, facsimile communications, and e-mails . . . with the intended purpose of hiding the overvaluation of NAWS' reserves and/or for avoiding payments due and owing Savage and others similarly situated pursuant to the agreements . . . ." See plaintiffs' complaint paragraphs 107-108.

The mail fraud statute prohibits any person from knowingly causing the use of the mails "having devised or intending to devise any scheme or artifice to defraud." 18 U.S.C. §1341. The wire fraud statute prohibits the use of any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice to defraud. 18 U.S.C. §1343. The wire fraud statute was patterned after the mail fraud statute, and it is interpreted consistently with that statute. *United States v. Computer Science Corp.,* 689 F.2 1181 (4th Cir. 1982), *cert. denied,* 459 U.S. 1105 (1983).

"Numerous federal courts have concluded that to maintain a successful RICO action, either civil or criminal, it is necessary to establish that the defendant acted with fraudulent intent. See *Kane v. Shearson Lehman Hutton*

---

3. 18 U.S.C. §1341.
4. 18 U.S.C. §1343.

*Inc.,* 916 F.2d 643 (11th Cir. 1990); *United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989); and *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46 (2d Cir. 1987). These courts have further concluded that fraudulent intent is a requisite element to establishing mail or wire fraud as the predicate acts giving rise to the RICO violation. *Beck v. Manufacturers Hanover Trust Co., supra.*" *Humphreys v. Niagara Fire Insurance Co.,* 404 Pa. Super. 347, 356, 590 A.2d 1267, 1272 (1991).

Additionally, when the predicate act is mail fraud, plaintiffs must "allege that they detrimentally relied in some way on the fraudulent mailing, and that the mailing was a proximate cause of the alleged injury to their business or property." *Chisolm v. TransSouth Financial Corp.,* 95 F.3d 311 (4th Cir. 1996).

As stated earlier, the existence and proof of reliance generally requires an individual determination as to each potential class member. *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 460, 470-71, 619 A.2d 769, 774 (1993). At this time, this court incorporates its reasoning set forth previously, and determines that this count is inappropriate for class certification on that basis, and also on the problems relating to damages.

### g. Negligence

Plaintiffs filed a count of negligence against the defendants Consumer Marketing Group and Life of the South Co., alleging that they had a duty to ensure that NAWS and IASI were properly administering the claims and/or reserves of the named plaintiffs. According to plaintiffs, CMG is an agent of NAWS and a wholly owned subsidiary of LOTS. According to defendant, NAWS

contracted with 15 independent marketing agents, like CMG and LOTS, throughout the country to market the extended warranty contracts to dealers and dealer groups.

This particular count involve defendants who may be secondarily liable through the alleged improper actions of the main defendants. Defendants CMG and LOTS could not be held negligent unless plaintiffs first establish that the other defendants improperly administered the claims and/or reserves. Thus, for plaintiff to prevail against CMG or LOTS, they would first have to prevail on one of the other theories against the other defendants. Since the other theories against the other defendants did not pass muster under the commonality requirement, the negligence action, for the same reasons, would also not be suitable for a class action.

Plaintiffs have failed to present sufficient evidence to meet their prima facie burden establishing a common question of fact and law as to negligence.

Again, plaintiffs cannot rely on Illinois law for the choice of law. In addition to reasons already set forth, this theory is not included within the choice of law provision in the contracts. The damages analysis previously stated would also apply here.

For all the foregoing reasons, this court finds that there are no sufficient common questions of fact or law on any count of the complaint to warrant class certification.

### 3. Typicality

Plaintiff must establish the claims or defenses of the representative parties are typical of the claims or defenses of the class. See Pa.R.C.P. §1702(3). "This requires that the class representatives' overall position *on the com-*

*mon issues* [be] sufficiently aligned with that of the absent class members to ensure that pursuit of [those] interests will advance those of the proposed class members." *Dunn v. Allegheny County Property Assessment Appeals,* 794 A.2d 416, 424 (Pa. Commw. 2002), quoting *Cook v. Highland Water and Sewer Authority,* 108 Pa. Commw. at 234 n.8, 530 A.2d at 505 n.8. (emphasis added) Since this court has determined that the commonality requirement has not been met, it must follow that the typicality requirement has also not been met.

Further, the Superior Court said that class actions are appropriate for "the aggregation of small claims which otherwise could not be litigated in individual actions." *Kelly v. Allegheny County,* 519 Pa. 213, 223, 546 A.2d 608, 612-13 (1988). This case, however, is not a small claim. Plaintiffs claim considerable damages. If other potential class members' damage claims are similar, then the class is not appropriate, as each can adequately represent its own interest. If other potential class members' damage claims are not similar, then the plaintiffs' claim cannot be labeled as typical, and class certification is inappropriate.

### 4. *Fair Representation*

The next factor for this court to consider is whether the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Pa.R.C.P. 1709. See Pa.R.C.P. 1702(4). Section 1709(a) says:

"In determining whether the representative parties will fairly and adequately assert and protect the interests of the class, the court shall consider among other matters

"(1) whether the attorney for the representative parties will adequately represent the interests of the class,

"(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and

"(3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed."

The defendants have not raised any grounds to object to the propriety of the plaintiffs' counsel. The evidence presented by plaintiffs is sufficient. The fourth requirement is met.

### 5. *Efficiency*

The final factor for this court's consideration is whether a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Pa.R.C.P. 1708. See Pa.R.C.P. 1702(5). The applicable section of this statute says:

"(a) Where monetary recovery alone is sought, the court shall consider

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would con-

front the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action."

In determining fairness and efficiency, we must balance the interests of the litigants, present and absent, and the court system. *Janicik.* Several of these factors, in particular subsections 1, 2, 6 and 7, have been considered extensively by this court in its determination, as more fully set forth in previous portions of this opinion. Further analysis under Rule 1708 is unnecessary. For the reasons set forth, this court holds that a class action would not be a fair or efficient method of adjudicating this case.

## III. CONCLUSIONS OF LAW

(1) The class is sufficiently numerous that joinder of all its members would be impractical.

(2) There is not a predominate question of law and fact common to the class.

(3) The claims raised by the representative party are not typical of the claims belonging to and necessary for, the protection of absent class members.

(4) Counsel for the representative party could fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709.

(5) Because of all the foregoing, analysis under Rule 1708, was unnecessary.

For all the foregoing reasons, this court determines that the instant case is not appropriate for disposition as a class action and enters the following order:

## ORDER

And now, September 24, 2002, after a hearing held, and upon consideration of the plaintiffs' motion for class certification, defendants' response, and all subsequent filings thereto, it is hereby ordered that plaintiffs' motion for class certification is denied.